IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MONTE SCOTT, a resident of the State of Oregon,

        Plaintiff,

v.

AMERICAN UNITED LIFE INSURANCE COMPANY, an Indiana corporation,

        Defendants.

CV No. 05-1215-AS

FINDINGS OF FACT AND CONCLUSIONS OF LAW

ASHMANSKAS, Magistrate Judge:

Plaintiff Monte Scott ("Scott") filed this action against his former employer, defendant American United Life Insurance Company ("AUL"), alleging claims for failure to pay upon termination, pursuant to ORS 652.140, and failure to pay minimum wages under 29 U.S.C. § 206 and ORS 653.025. AUL asserts counterclaims for overpayment of compensation and breach of contract/failure to pay. The court has jurisdiction over the federal minimum wage claims under 29 U.S.C. § 216(b) and pendent jurisdiction over the Oregon statutory claims under 28 U.S.C. § 1331.

The parties waived a jury and consented to trial and entry of judgment by this court. Considering the evidence of record, including the testimony and exhibits offered by the parties, the court makes the

1 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

following findings of fact and conclusions of law.

## FINDINGS OF FACT

Scott began working for AUL's predecessor in interest, Pioneer Mutual Life ("PML"), in 1992 as a life insurance agent. On January 11, 2001, PML offered to enter into a relationship with Scott as a Managing General Agent, an independent contractor to recruit agents to sell PML's products.

Scott subsequently formed a corporation, Great Northwest Insurance Services ("Great NW"), on August 30, 2001. Scott was the sole officer, shareholder and employee of Great NW. On January 1, 2002, PML and Scott, as President of Great NW, executed a Managing General Agent ("MGA") agreement, which provided for compensation in the form of commissions. Those commissions would be vested, and payable after the termination of the agreement, so long as it was not for cause (Ex. 42, p. 4).

At the same time, Scott and PML executed an "Advance Compensation Addendum" (Ex. 43), which provided that PML would pay "advance compensation to the MGA," in the amount of $9,000 per month for a maximum potential period of 12 months, commencing January 1, 2002." PML subsequently changed its universal life product, and Scott maintains that it was more difficult to recruit agents to sell the new product. As time passed under the terms of the MGA agreement, Scott incurred an increasing amount of debt representing the difference between his advanced compensation and his earned commissions.

Defendant AUL subsequently bought PML and, on March 4, 2003, offered to employ Scott as Regional Vice President-PML ("RVP") (Ex. 101) under the following terms of compensation: (1) base salary of $1,666.67 per month; (2) fringe benefits; (3) travel and entertainment allowance

2 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

(treated as compensation) in the amount of $1,550 per month in 2003 and $1,060 per month in 2004; (4) an office expense allowance, treated as compensation, in the amount of $1,000 per month; (5) three weeks of paid vacation (prorated in 2003), including 160 hours of accumulated time upon hire; and (6) a variable pay plan that guaranteed $18,000 per quarter through 2003.

Regarding the variable pay plan's guarantee of $18,000 per quarter in 2003, the offer explained that, if Scott earned less than $18,000 in commissions (a.k.a. "overrides") during any quarter of 2003, AUL would make up the difference to the extent the earned commissions fell short of $18,000. If Scott's quarterly commissions exceeded $18,000, he would earn the entire amount, including the portion thereof that exceeded the guarantee. As such, the guarantee was in the interests of both parties by: (1) providing a transitional period of stable pay in consideration of Scott's willingness to accept a higher degree of variable pay (commissions) than he had had in his compensation package with PML; (2) to the extent it allowed him to retain commissions earned in excess of $18,000 per quarter, it provided an incentive for Scott to increase the sales of AUL's products by the independent agents he recruited; and (3) by immediately providing Scott the opportunity to maximize his compensation through commissions, it provided a mechanism through which he might adapt more quickly to the variable pay plan that would be fully in effect when the guarantee expired at the end of 2003.

Scott maintains that the offer was to pay the entire guaranteed amount of $18,000 per quarter in addition to commissions. That construction, however, runs contrary to the plain language of the RVP agreement. Furthermore, it is inconsistent with the parties' intentions, as manifested in the context of the entire agreement, for the guarantee to serve the purposes described above.

In contrast to the MGA agreement with PML, commissions earned under the RVP would not

3 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

be vested, *i.e.*, to receive commissions earned under the RVP agreement, he would have to be employed by AUL at the time they were distributed.

AUL's offer of employment also specifically addressed the debt incurred under the 2002 Advance Compensation Addendum, providing that: (1) fifty percent of the "Advanced Debt" would be forgiven if Scott obtained two specific professional licenses by September 1, 2003: and (2) fifty percent would be forgiven after Scott had completed 21 full months as a regular full-time employee of AUL. Scott manifested his acceptance of the offer, by adding, "OK with me," and his signature to the letter containing the offer's terms and conveying a copy of it to AUL.

Scott began working as an employee of AUL on April 1, 2003, and received his first payment of salary and guarantee from AUL on April 18, 2003. Scott did not obtain the professional licenses specified in the RVP agreement, but AUL allowed comparable licenses to substitute and forgave fifty percent of the debt.

On October 30, 2003, Scott provided four weeks written notice of his resignation to his supervisor, Larry Stoa. On October 31, 2003, David Todd, Human Resources Director for AUL, informed Scott that pursuant to its corporate policy allowing for two weeks notice, AUL would consider November 13, 2003, as his date of separation. Mr. Todd also informed Scott that AUL was suspending payment of any compensation due to Scott on the next pay day, November 5, 2003, and instructing PML to do the same, while AUL reconciled the remaining advance compensation debt and unresolved compensation issues (Ex. 6). Scott responded that the advance compensation debt has been forgiven when Doug Oksendahl and Duane Engebretson were with PML, *i.e.*, before the execution of the RVP employment agreement between Scott and AUL.

The "unresolved compensation issues" cited by Mr. Todd referred to AUL's discovery that,

4 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

since he had become an employee on April 1, 2003, AUL had paid Scott the full amount of his guarantee without regard to the amount of commissions he earned. This oversight occurred because AUL paid Scott's base salary and the guarantee from its offices in Indianapolis, Indiana, while the commissions earned under both the MGA and RVP agreements were calculated and paid by AUL's subsidiary, PML, from its offices in Fargo, North Dakota.

AUL's instruction to PML to cease further payments to Scott caused PML to withhold not only commissions earned under the RVP agreement, but also the vested commissions earned and payable to Scott under the prior MGA agreement. AUL withheld these elements of compensation for the express purposes of: (1) calculating the amount Scott was paid in excess of the terms of the RVP agreement, specifically the guarantee provision; (2) determining the remainder of advance compensation debt; and (3) offsetting those amounts from the compensation due to Scott.

On October 31, 2003, AUL informed Scott that it would continue to suspend compensation due on the next pay date, November 5, 2003, including accrued vacation, and would likely do the same in regard to compensation that would become due on the subsequent pay date, November 20, 2003, while it continued to calculate offsets (Exs. 17, 18). On November 13, 2003, AUL informed Scott of the amount it claimed as an offset to his compensation, including approximately $21,000 in advance debt.

On November 26, 2003, Scott's attorney made a written demand for payment of all compensation due. On December 16, 2003, AUL's attorney offered to apply the compensation demanded against the offset for overcompensation claimed by AUL. Scott did not respond. At the time of trial, AUL had continued to withhold compensation due Scott, including salary from October 16, 2003, commissions earned under the MGA and RVP agreements from October 28, 2003, as well

5 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

as accrued vacation.

## CONCLUSIONS OF LAW

I.  Failure to Pay Upon Termination

AUL concedes that it failed to pay Scott upon termination pursuant to ORS 652.140(1), and that its failure was willful, entitling Scott to a penalty pursuant to ORS 652.150.

When employment is terminated, ORS 652.140 places limits on the time within which an employer must pay "all wages due and payable." The term "wages" has been construed broadly, to include "all compensation for services provided by an employee." See Wyatt v. Body Imaging, P.C., 989 P.2d 36, 39, 163 Or. App. 526 (1999) (en banc)(holding that deducted but unpaid health insurance premiums are "wages" under ORS 652.140(2)). Thus, the date upon which Scott ceased providing services to AUL is relevant to the calculation of unpaid wages. Scott concedes that he did no actual work for AUL after October 31, 2003. The evidence is more persuasive, however, that he performed no work for AUL after October 28, 2003.

Furthermore, the calculation of unpaid wages should reflect AUL's policy providing for two weeks notice of resignation and generalized allotment of 173.33 hours per employee, per month (approximately 40 hours per week or 8 hours per business day).

In light of these factors, Scott is entitled to damages for unpaid compensation consisting of: (1) base salary AUL failed to pay under the RVP agreement from October 15, 2003, to November 13, 2003, in the amount of $1,666.67; (2) accrued vacation AUL failed to pay, calculated using his base salary rate, in the amount of $865.38; (3) travel, entertainment and office allowances AUL failed to pay from October 15, 2003, to October 28, 2003, when Scott ceased performing services as RVP, in the amount of $1,275.00; (4) unpaid commissions under the RVP agreement, payable

6 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

from October 29, 2003, so long as Scott was an employee, through November 13, 2003, in the amount of $4,556.51; and (5) unpaid, vested commissions earned under the MGA agreement since October 28, 2003, which were $6,262.65 at the time of trial, and continue to accrue.

Scott is not entitled to any compensation under the Variable Pay Plan's guarantee provision because the amount of commissions he earned under the RVP agreement during the relevant time period (that portion of the last quarter of 2003 during which he was an employee of AUL) exceeded the prorated guarantee for the same period.

Because AUL's failure to pay Scott was willful, he is also entitled to be awarded a penalty, as provided under ORS 652.150, and calculated pursuant to OAR 839-001-0470(1), which provides in relevant part:

> "(c) The maximum penalty will be no greater than the employee's hourly rate of pay times 8 hours per day times 30 days.
>
> "(d) Except as provided in subsection (e), the wages of an employee that are computed at a rate other than an hourly rate (*e.g.* salaries) will be reduced to an hourly rate for penalty computation purposes by dividing the total wages earned during the wage claim period (the period for which wages are owed and upon which the wage claim is based) by the total number of hours worked during the wage claim period.
>
> "(e) Notwithstanding subsection (d), when wages are earned based on commission, bonus, piece rate, or other methods not based on hours worked, the wages will be reduced to an hourly rate for penalty computation purposes by dividing the total wages earned in the last 30 calendar days of employment by the total number of hours worked in the last 30 calendar days of employment."

Because he received compensation in the form of salary and commissions, the hourly rate applicable to Scott's penalty claim must be calculated using both of the methods set forth under OAR 839-001-0470(1)(d) and (e).

The salary-based component of the penalty rate is calculated, as provided under OAR 839-

7 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

001-0470(1)(d), by dividing the wages earned during the wage claim period by the number of hours worked during the same interval. The applicable "wage claim period," as referenced in this section, is based on the award of unpaid compensation set forth above, which includes a 30-day wage claim period for base salary and a two-week wage claim period for allowances. This distinction in the two wage claim periods is reasonable in light of the purposes underlying base salary as opposed to the allowances, as well as AUL's policy providing for two week's notice, from which it may reasonably be inferred that severance will be paid at the base salary rate during that interval.

Thus, the salary-based component of the penalty rate comprises: (1) $9.62 per hour in base salary ($1,666.67 per month, for October 15, 2003, to November 13, 2003, divided by 173.33 hours); and (2) $15.94 per hour in travel, entertainment and office allowance compensation ($1275.00, from October 15, 2003, to October 28, 2003, the period during which Scott maintained an office, traveled and/or entertained on behalf of AUL, divided by 80 hours).

To calculate the penalty component based on commissions, the applicable regulation, OAR 839-001-0470(1)(e), provides that the earnings during the last 30 days of employment are to be divided by the actual hours worked during that same period. In contrast to the salary-based penalty component, the termination of the claimant's status as an employee, rather than the termination of the claimant's services, dictates the relevant period of time from which the penalty rate is calculated. In this manner, the regulation reflects the fact that commissions may be earned passively.

In this case, AUL concedes that Scott remained an employee through November 13, 2003. That date, rather than the date he ceased providing services to AUL, on October 28, 2003, dictates the last 30 days of Scott's employment for purposes of OAR 839-001-0470(1)(e).

Thus, the commission-based penalty component is calculated using earned commissions from

8 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

October 15, 2003, through November 13, 2003, and the actual number of hours worked during that same period, which is found to be 80, as Scott ceased to provide services to AUL after October 28, 2003. Consequently, the commission-based component of the penalty rate comprises: (1) $135.10 per hour under the RVP agreement ($10,808.02 in commissions earned and payable from October 15, 2003, through November 13, 2003, divided by 80); and (2) $11.67 per hour under the MGA agreement ($933.24 earned from October 15, 2003, through November 13, 2003, divided by 80).

The commissions earned under the MGA agreement are a component of Scott's wage claim against AUL because AUL assumed PML's liabilities, as well as its assets, when it acquired PML as a subsidiary. This is manifested by AUL's: (1) offer of terms under which it would forgive debt owed to PML; (2) demonstrated ability to direct and control whether PML made payments to Scott of commissions earned under the MGA agreement; and (3) claim to offset amounts paid to Scott in conjunction with PML. Furthermore, though commissions earned under the MGA agreement were paid through October 28, 2003, the amount earned during the entire 30 days preceding separation must be used to calculate the penalty. OAR 839-001-0470(1)(e).

The sum of the four components of the penalty rate applicable to Scott's claim, as calculated pursuant to ORS 652.150 and OAR 839-001-0470(1), is $172.33 per hour. At that rate, the penalty, limited to a 30-day period of accrual and AUL's allotment of 173.33 hours per employee per month, is $29,869.96.

II. <u>Minimum Wage Claim</u>

AUL is entitled to judgment in its favor on Scott's minimum wage claims, because Scott was exempt from the minimum wage requirements of Oregon and federal law. The minimum wage requirements of the Fair Labor Standards Act, 29 U.S.C. § 206, did not apply to Scott because he

9 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

was "employed in a bona fide executive, administrative, or professional capacity" as provided under 29 U.S.C. § 213(a)(1).

Likewise, his claim under Oregon's minimum wage law fails in light of ORS 653.020(3), which exempts any individual:

"engaged in administrative, executive or professional work who:

(a) Performs predominantly intellectual, managerial or creative tasks;

(b) Exercises discretion and independent judgment; and

(c) Earns a salary and is paid on a salary basis."

As relevant to these claims, the court specifically adopts the findings of fact enumerated 2 through 7 on page 4 of AUL's Proposed Findings of Fact and Conclusions of Law (No. 51). In light of these and the previous findings above, Scott's employment met both the salary and duty tests applicable to deem him exempt from Oregon and federal minimum wage requirements, under the standards set forth in 29 C.F.R. 541.201-.203. See Rowe v. Laidlaw Transit, Inc., 244 F.3d 1115, 1117 (9th Cir. 2001), citing Serv. Employees Int'l Union v. Local 102 v. County of San Diego, 60 F.3d 1346, 1350 (9th Cir. 1994) (applying standards set forth in federal regulations to exemption pursuant to 29 U.S.C. 213(a)(1) and ORS 653.020(3)); See also Barner v. City of Novato, 17 F.3d 1256, 1259-61 (9th Cir. 1994) (describing salary and duty tests).

Consequently, Scott is entitled to no relief, and AUL is entitled to judgment in its favor, on Scott's Oregon and federal claims for failure to pay minimum wages.

III.   AUL's Counterclaim for Overpayment of Compensation Under the RVP Agreement

AUL's claim is viable only to the extent Scott was overcompensated under the RVP agreement. That is because the commissions earned under the MGA agreement were vested, and

10 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

moreover, were not addressed in the guarantee provision or elsewhere in the RVP agreement.

For the second quarter of 2003, Scott was paid RVP commissions of $7,267.30. Under the guarantee, Scott was entitled to the difference between that amount and the guarantee of $18,000, or $10,732.70. AUL, however, paid him the full amount of the guarantee, resulting in an overpayment of $7,267.30 for the second quarter.

For the third quarter, Scott earned $28,133.26 in RVP commissions, an amount in excess of the guarantee. Consequently, he was entitled to no additional compensation under the guarantee provision. AUL, however, paid him the full amount of the guarantee, resulting in an overpayment of $18,000 for the third quarter.

For the portion of the fourth quarter in which Scott was an employee of AUL (October 1, 2003, through November 13, 2003), he earned an amount of RVP commissions that exceeded $9,000, the amount provided under the guarantee, prorated for the same period. Nonetheless, AUL paid him an additional $3,000, resulting in an overpayment of $3,000 for the fourth quarter of 2003.

The total paid to Scott, to which he was not entitled under the RVP agreement, was $28,267.30. The circumstances that caused the overpayment— the period of adjustment in the wake of AUL's acquisition of PML—as well as AUL's prompt response upon discovering the overpayment, reasonably excuse AUL from being bound by its course of conduct. To the extent AUL's "prompt response" violated ORS 652.140, it is already being penalized under ORS 652.150 and should not be further penalized by denying the merits of this claim.

Consequently, AUL is entitled to relief in the amount of $28,267.30 on its counterclaim for overpayment of compensation.

IV.     AUL's Counterclaim to Recoup the Remaining Advance Debt

11 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

AUL also seeks to recover the remaining portion of the debt accrued under the Advanced Debt Addendum with PML, a right it specifically reserved in the RVP agreement. Half of the debt was forgiven in light of professional licenses obtained by Scott. Scott, however, failed to meet the condition precedent to AUL's promise to forgive the remaining portion of the debt, *i.e.*, completing 21 months of employment with AUL.

The debt was not forgiven prior to the execution of the RVP agreement. The parties' intentions in that regard are clearly manifested in the RVP agreement, which in plain language, acknowledges the existing debt as well as the terms under which it was mutually acceptable to forgive it.

AUL's claim is also viable because it assumed PML's right to collect the debt accrued under the MGA agreement. That is evident for the same reasons listed above that AUL is liable for failing to pay wages due under the MGA agreement.

Scott is personally liable for the debt, as opposed to his corporation, Great NW, because he assumed the debt when he executed the RVP agreement, and furthermore, because he did not distinguish between the rights and obligations of Great NW and those of himself as an individual. For example, commission checks payable to Great NW were directly deposited by PML into Scott's personal account. As relevant to this counterclaim, I specifically adopt the findings enumerated 1 through 10 on page 15 of AUL's Proposed Findings of Fact and Conclusions of Law (No. 51).

Scott's assertion that the debt is $12,970.95, or half of the debt accrued as of December 31, 2002, fails to account for debt accruing between that date and the date the RVP agreement was executed, a period in which Scott acknowledges it became more difficult to market PML's new universal life product.

AUL is entitled to relief in the amount of $21,092.86 and judgment in its favor on its counterclaim to recover advance debt.

## CONCLUSION

In sum, the parties are entitled to the following relief:

1.  To plaintiff, Monte Scott, judgment in his favor on his claim that AUL failed to pay him upon separation, in violation of ORS 652.140, including:

    A.  An award of damages for unpaid compensation in the amount of $8,363.66, plus commissions earned under the MGA agreement since October 28, 2003, which were $6,262.65 at the time of trial;

    B.  An award of penalty wages, as provided by ORS 652.150, in the amount of $29,869.96; and

    C.  A reasonable attorney fee as provided by ORS 652.200.


2.  To defendant, American United Life Insurance Company:

    A.  Judgment in its favor on plaintiff's claim that it failed to pay minimum wages required under 29 U.S.C. § 206(b);

    B.  Judgment in its favor on plaintiff's claim that it failed to pay minimum wages required under ORS 653.055;

    C.  Judgment in its favor on its counterclaim to recover overcompensation from plaintiff, including an award of damages in the amount of $28,267.30;

    D.  Judgment in its favor on its counterclaim to recover advance debt from plaintiff, including an award of damages in the amount of $21,092.86.

13 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

The parties shall bear their respective costs.

IT IS SO ORDERED this 27th day of September, 2007.

                                              DONALD C. ASHMANSKAS
                                              United States Magistrate Judge